**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0554n.06

No. 09-6091

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Aug 09, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| v. | ) | |
| | ) | |
| | ) | OPINION |
| ROY LACY COBB, | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

**Before: MOORE and GIBBONS, Circuit Judges; BORMAN, District Judge.**[*]

   **PAUL D. BORMAN, District Judge**.   Roy Lacy Cobb was indicted by a grand jury

in the Eastern District of Kentucky in a second superseding indictment on January 22, 2009, charging

eleven (11) counts of knowingly and intentionally distributing oxycodone, a Schedule II controlled

substance, to a number of different individuals over a three-year period, in violation of 21 U.S.C. §

841(a)(1). The indictment also charged Cobb with two (2) counts of knowingly and intentionally

distributing oxycodone to individuals under the age of twenty-one, in violation of 21 U.S.C. §

841(a)(1) and § 859(a). The indictment further charged Cobb with money laundering in violation

of 18 U.S.C. § 1956(a)(1)(B) (i), and sought forfeiture pursuant to 21 U.S.C. § 853 and 18 U.S.C.

_____

[*]The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan,
sitting by designation.

§ 982(a)(1). On January 29, 2009, Cobb pleaded not guilty to the 16 counts in the second superseding indictment. Just prior to trial, the Government moved to dismiss six counts of the indictment: 6,7,9,14,15 and 16.

Cobb's trial began on February 17, 2009 and on February 20, 2009, following four days of trial, and two hours of deliberation, the jury returned a verdict of guilty on all ten remaining counts. The District Court held a sentencing hearing on August 26, 2009 and sentenced Cobb to 240 months imprisonment on each of Counts One, Three, Five, Eight and Ten through Thirteen, and a term of 300 months imprisonment on each of Counts Two and Four, to be served concurrently for a total term of 300 months. The District Court applied an upward departure for multiple sexual acts against ten or more individuals, and a two-level enhancement for possession of a firearm in connection with a drug transaction. Cobb was further sentenced to six (6) years of supervised release.

Cobb now appeals his conviction alleging three grounds for reversal: (1) that the District Court abused its discretion in admitting a photograph of the Defendant receiving oral sex from one of the Government's witnesses; (2) that the District Court abused its discretion in concluding that one of the Government's witnesses was competent to testify; and (3) that the District Court erred in assessing a two-level enhancement for possessing a weapon deemed available for use in connection with a drug transaction. For the reasons that follow, we **AFFIRM** the conviction and sentence.

I.      **BACKGROUND**

A.      **The Charges Against Cobb**

On September 23, 2008, the Government filed a Criminal Complaint in the Eastern District of Kentucky against Cobb, charging him with knowingly or intentionally distributing oxycodone,

a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) from on or about June, 2005 through June, 2008. On September 24, 2008 a grand jury returned a one-count indictment, charging Cobb with a violation of 21 U.S.C. § 841(a)(1). On November 20, 2008, the grand jury returned a four-count superseding indictment, repeating the charge contained in the original indictment and adding one count of money laundering and two counts of forfeiture. On January 22, 2009, the grand jury returned a sixteen-count second superseding indictment relating to conduct that occurred between June, 2005 and September, 2008, charging eleven separate counts of knowingly and intentionally distributing oxycodone to unnamed individuals in violation of 21 U.S.C. § 841(a) (Counts 1, 3, 5 through 13), two counts of knowingly and intentionally distributing oxycodone to two unnamed individuals under the age of twenty-one in violation of 21 U.S.C. § 859(a) (Counts 2 and 4), one count of money laundering (Count 14), and two counts of forfeiture (15 and 16.) The statutory penalties for Counts 1, 3, 5-13 were not more than 20 years imprisonment, $1,000,000 fine and at least 3 years supervised release (increased to 30 years imprisonment, $2,000,000 fine and at least 6 years supervised release if a prior felony drug conviction is involved). The penalties for Counts 2 and 4 were not less than 1 year and not more than 40 years imprisonment, $2,000,000 fine and at least 6 years of supervised release (increased to not less than 1 year and not more than 60 years imprisonment, $3,000,000 fine and at least 9 years supervised release if a prior conviction under these sections is involved). The penalties for Count 14 were not more than 5 years imprisonment, $250,000 fine and 3 years supervised release. The Penalties for Counts 15 and 16 were forfeiture of the listed property. Cobb, who had been in custody since September 23, 2008, was

3

arraigned on January 29, 2009, and entered not guilty pleas on all counts and was returned to the custody of the United States Marshals.

## B.     The Trial and Verdict

The jury trial began on February 17, 2009. The first morning of trial, the Government moved to dismiss Counts 6, 7, 9, 14, 15 and 16 of the second superseding indictment, explaining that: "Despite the better efforts of law enforcement, we've been unable to find a couple of our witnesses, and, therefore, we will move to dismiss, it looks like six counts of the indictment." (R. 94, Transcript of Trial February 17, 2009 ("TT1") 4-5.)[1]  The trial proceeded on the remaining ten counts.

The Government's first witness was M.C., the Defendant's twenty-two year old daughter. M.C. testified that she moved back into her parents' home sometime in the Spring or Summer of 2006 and that some months after that she first began taking oxycontin pills.[2]  She testified that she received her first oxycontin pill, and several thereafter, from her father, the Defendant. She testified that he gave her the pills at first "for [her] silence, so that [she] didn't tell [her] mother about what [she had] seen," referring to sexual encounters she had observed between her father and other "girls." (R. 94, TT1, M.C. 204-08.) M.C. testified that at the time she received her first oxycontin pill from her father, he also gave a pill to D.A. and that she and D.A. went into a bedroom and

---

[1]Unless otherwise indicated, the reference (R._) indicates the Docket Entry Number on the District Court Docket.

[2]The oxycontin pills described by the various witnesses contained varying amounts of oxycodone, a Schedule II controlled substance. The witnesses ingested the drugs through different methods, either swallowing, snorting and/or injecting the pills in a solution intravenously.

"took" their pills - M.C. snorted hers and D.A. injected hers. M.C. testified that her father began to give her a pill a day thereafter.

M.C. identified multiple women, most in their twenties, whom she had personally observed at her parents' home receiving oxycontin pills from her father and whom she had perceived to be engaging in various sexual acts with her father in connection with receiving the pills. M.C. also testified that she observed her father take pictures with his cell phone of the bare breasts of various women who were visiting the Defendant's home, to whom her father then gave oxycontin pills. She identified her father's cell phone, which was introduced by the Government at trial.

M.C. testified that she received her last oxycontin pill from her father on March 17, 2008, the night before she was arrested for robbing a pharmacy and stealing 8,000 oxycontin pills. She testified that she pleaded guilty to the robbery offense, for which she remained imprisoned at the time of his trial, and that in connection with her guilty plea, she provided information to the Government about her father's activities. She testified at trial that she agreed to give testimony in support of the Government's case against her father with the potential, but not the promise, that she could receive credit against her sentence for her truthful testimony.

Richard Dalrymple was a Laurel County Sheriff's Office detective who was working with the Drug Enforcement Administration Task Force in connection with the investigation into M.C.'s robbery of the Rite-Aid Pharmacy and theft of the 8,000 oxycontin pills. Officer Dalrymple testified that he interviewed M.C. in connection with his investigation of the robbery after M.C.'s attorney reached out to him with a potential proffer interview that M.C. was willing to give to the Government. Officer Dalrymple testified that during his interview with M.C., she explained to him

that she had received her first oxycontin pill from her father, and she told him that "numerous younger females" came to her home to receive oxycontin pills from her father in exchange for sexual favors. Officer Dalrymple testified that M.C. identified several of those individuals, some only by first name, and from that information he initiated his investigation into the Defendant's activities.

Based on the information received in the course of his investigation and interviews with numerous women who corroborated the information conveyed in M.C.'s proffer interview, Officer Dalrymple obtained a search warrant for the Defendant's home which was executed on June 27, 2008, in the presence of the Defendant. The search uncovered 31 empty pill bottles, each bearing a written prescription for the Defendant for oxycontin or oxycodone. The officers also seized the Defendant's cell phone from his pants pocket during the search of his home. The Government introduced the Defendant's cell phone into evidence through Dalrymple's testimony, over an objection from Defendant's counsel, who admitted in colloquy that he knew the Government was planning to move to admit the cell phone and its contents and conceded that he had not previously objected to admission of the cell phone or its contents through a motion to suppress or otherwise. Officer Dalrymple also obtained a warrant and executed a search of the Defendant's trailer/camper, located in a neighboring county in Kentucky, and seized additional empty prescription bottles and two firearms, a revolver and a rifle, with ammunition.

Many of the women interviewed by Officer Dalrymple and identified by M.C. at trial, testified at trial and confirmed M.C.'s testimony that they received oxycontin pills from the Defendant in exchange for various sexual favors which they performed for the Defendant -- showing their bare breasts, performing oral sex, having sexual intercourse with the Defendant, or having sex

with other women for the Defendant's viewing pleasure. S.D. testified that she received over 100 oxycontin pills from the Defendant, never more than one or two on any given day, in exchange for performing oral sex or having sexual intercourse with the Defendant. S.D. testified that she was eighteen at the time she first met the Defendant (who was then in his fifties) and was that day given her first oxycontin pill. She testified that she would not have had sex with the Defendant had it not been for the fact that he had something she wanted - oxycontin. S.D. ultimately had the Defendant's child. Paternity was established by a DNA test performed in the course of a custody battle.

S.D. introduced her sister, R.D., to the Defendant in July, 2005. R.D. was 20 years-old at the time she met the Defendant (who was then 55 years-old) and testified at trial that she had to show him her bare breasts that day in exchange for an oxycontin pill. R.D. testified that she received an oxycontin pill approximately every other day thereafter and in exchange would have to perform oral sex on the Defendant, have intercourse with him, or have sex with other girls in front of him. R.D. also identified the Defendant's cell phone, which she testified he used to take pictures of her and other women naked. She identified pictures of herself and another woman, F.F., which were taken from the Defendant's cell phone. Several other women testified to a similar pattern of receiving oxycontin pills from the Defendant in exchange for sexual favors and identified pictures of their bare breasts that appeared on his cell phone.

T.M. testified that she received oxycontin pills from the Defendant and had to have oral sex with the Defendant in exchange for the pills. On one occasion, T.M. testified, the Defendant told her to have sex with a "neighbor boy" and gave her oxycontin when she complied with his request. T.M. testified that she had once traded a stolen gun to the Defendant in exchange for oxycontin.

In the course of her testimony, L.G. identified a picture of herself, taken from the Defendant's cell phone, showing her bare breasts. The photograph was introduced without objection. L.G. identified a second picture of herself, also taken from the Defendant's cell phone, performing oral sex on the Defendant. The photograph was introduced over defense counsel's objection on the grounds of the photograph's prejudicial effect.

The Government also introduced the testimony of D.A., whose trial testimony often contradicted statements that she had previously made to Officer Dalrymple in the course of his investigation, which prompted counsel for the Government to request permission to examine D.A. as a hostile witness. The Government, at the time of trial, was fearful that D.A. was acting "flighty" and might in fact fail to appear as subpoenaed. In response to the Government's concerns, the District Court examined the witness outside the presence of the jury to ensure that she understood the oath, that she understood her right not to testify against her own interests and that she was not feeling the effects of drugs or alcohol at the time of her testimony. Neither trial counsel objected to this process, or to the District Court's decision to permit D.A. to testify in the presence of the jury.

D.A. testified that she had no recollection of ever having performed oral sex on the Defendant and that he had only given her oxycontin pills twice, when she was "sick." This testimony contradicted statements contained in the Presentence Report ("PSR") that she allegedly made to Officer Dalrymple in the course of his interview with D.A. The PSR indicates that D.A. stated that when she realized that flirting with the Defendant was not going to get her oxycontin, she began performing oral sex on him for pills and did so "dozens" of times. The PSR also indicates that D.A. told Officer Dalrymple that she had been threatened by the Defendant's family.

At the close of the Government's case, the Defendant moved for a judgment of acquittal, which the District Court denied. The defense presented three witnesses; Defendant did not testify on his own behalf. The jury deliberated for two hours and returned a verdict of guilty on all counts.

## C.     Sentencing

The District Court conducted a Sentencing Hearing on August 26, 2009, during which the Court ruled on a number of Defendant's objections to the PSR. The Defendant's objections were based principally on his contention that under the holding of the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the jury was required to determine beyond a reasonable doubt the specific weights of the oxycodone he was alleged to have distributed, and that its failure to determine beyond a reasonable doubt that he had engaged in sexual conduct of a victimizing nature, precluded any enhancements or departures in sentencing based on those facts. The District Court rejected the *Apprendi* challenge, noting that the recommended sentence was well below the statutory maximum and ruling that *"Apprendi* correctly applied does not require those facts to be proved beyond a reasonable doubt." (R. 98, Sent. Hr'g Tr. 38-40, 49-52.) The Defendant does not raise the *Apprendi* issue on appeal.[3]

---

[3]On February 15, 2011, the Defendant filed a motion in this Court for an extension of time and to hold this matter in abeyance to permit him to file a supplemental *pro se* brief on appeal, in which he proposed to raise the *Apprendi* claim along with several claims of ineffective assistance of counsel. The Clerk of this Court denied the motion to file a supplemental brief pursuant to Rule 45(a) of the Rules of the Sixth Circuit. No motion for reconsideration of the Clerk's Order was filed pursuant to Sixth Circuit Rule 45(b). (Ct. of Appeals Case No. 09-6091, Feb. 15, 2011 Motion; March 1, 2011 Order.) Thus, those claims are not properly before us and this matter is decided on the briefs submitted by Defendant's counsel. *United States v. Strickland*, 342 F. App'x 103, 106 (6th Cir. 2009).

The Defendant also objected at the Sentencing Hearing to the recommended two-point enhancement, under United States Sentencing Guideline 2D1.1(b)(1), for possession of a firearm deemed available for use in connection with a drug transaction. The Defendant argued that, apart from the testimony of one witness, no evidence was presented that he ever possessed a gun. The District Court ruled that the testimony of T.M. that on one occasion she traded the Defendant a firearm for oxycodone, along with the evidence presented that guns were observed by several witnesses when oxycontin was being distributed in the Defendant's camper/trailer, was sufficient to support the two-level enhancement under 2D1.1(b)(1). The Defendant does challenge this ruling on appeal.

The District Judge determined that the correct Guideline range was 210-260 months. (R. 98, Sent. Hr'g Tr. 100.) The District Judge permitted the Defendant to allocute extensively at his sentencing. Defendant's other daughter, C.C., testified on her father's behalf at the Sentencing Hearing. The District Judge then discussed the factors required to be taken into account under 18 U.S.C. § 3553(a). The District Judge concluded that aggravating factors existed that were not adequately taken into account by the Sentencing Commission in formulating the Guidelines which supported an upward departure. The District Judge imposed a sentence of 240 months imprisonment on Counts 1, 3, 5, 8 and 10-13, and a sentence of 300 months imprisonment on Counts 2 and 4, to be served concurrently for a total term of imprisonment of 300 months, imposing an upward departure for multiple sexual offenses against at least ten individuals, and applying a two-level enhancement for possession of a firearm in connection with a drug transaction and also imposing numerous conditions of supervised release. (R. 98, Sent. Hr'g Tr. 105-12.)

The Defendant filed his appeal papers at the Sentencing Hearing and requested that he be appointed new counsel for his appeal. On September 16, 2009, Defendant's trial counsel filed a motion to withdraw in this Court. On that same day, this Court granted Mr. Gordon's motion, indicating that it would appoint new counsel for the Defendant under the Criminal Justice Act. On November 18, 2009, this Court appointed appellate counsel.[4]

## II.   ANALYSIS

### A.   Standard of Review

"A district court's evidentiary rulings are reviewed for abuse of discretion." *United States v. Dixon*, 413 F.3d 540, 544 (6th Cir. 2005) (citing *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004)). "An abuse of discretion occurs when a district court relies on clearly erroneous findings of fact, improperly applies the law or uses an erroneous legal standard." *Id*. (citing *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir.1995)). "In reviewing a trial court's evidentiary determinations, this court reviews *de novo* the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Baker*, 458 F.3d 513, 516 (6th Cir. 2006) (internal quotation marks and citations omitted). "Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and

---

[4]The Court notes that in his February 15, 2011 motion for extension of time and to file a supplemental *pro se* brief in this Court, the Defendant expressed great dissatisfaction with both trial and appellate counsel. On December 16, 2009, in response to an earlier-filed letter in which the Defendant complained about his counsel, the Clerk of this Court informed the Defendant by letter that the Court is unable to intervene between a party and his appointed counsel. Appellate counsel has never withdrawn as Defendant's counsel and continues to represent the Defendant in this appeal. Issues of ineffective assistance of counsel, both trial and appellate, are properly raised, after this direct appeal, in a timely-filed motion in the trial court under 28 U.S.C. § 2255.

prejudice, and those decisions will not be lightly overruled." *United States v. Chambers*, 441 F.3d

438, 455 (6th Cir. 2006) (quoting *Dixon*, 413 F.3d at 544).

Sentences in a criminal case are reviewed for procedural and substantive reasonableness.

*Gall v. United States*, 552 U.S. 38, 51 (2007). Such review is conducted under the deferential abuse

of discretion standard. *United States v. Novales*, 589 F.3d 310, 314 (6th Cir. 2009). Substantive

reasonableness claims need not be raised before the district court to be preserved for appeal. *United*

*States v. Penson*, 526 F.3d 331, 337 (6th Cir. 2008).

> **B.** **The District Court Did Not Err In Admitting Into Evidence the Photograph of
> L.G. Performing Oral Sex on the Defendant**

During the trial, the District Court permitted the jury to view four photographs that were

retrieved from the Defendant's cell phone, burned onto a CD and reprinted for viewing at trial.[5]

---

[5]The defense never objected to the search warrant execution that resulted in the seizure of the
Defendant's cell phone and never moved to suppress the cell phone or its contents. During colloquy
with the District Court and the Government concerning the jury viewing the photographs, counsel
for the Defendant did not question the authenticity of the photographs: "I hadn't said anything - of
course, I don't know how - now, these pictures apparently, I don't know who developed them, how
they were made. I mean, they say they're taken off the phone. I have no reason to doubt that, I guess,
Your Honor . . . but I don't know how they were blown up like this." (R. 95, TT2, Colloquy 288.)
Following the Government's response that the photographs were taken off of Defendant's cell phone,
transferred to a CD, and printed off of the CD on a regular printer, Defendant's counsel never again
challenged the authenticity of the photos and ultimately only objected to the jury's viewing one of
the photographs, that depicted an act of oral sex, on the grounds that its prejudicial effect
substantially outweighed its probative value. *See* Fed. R. Evid. 403.

Later in the trial, when the Government moved to admit the cell phone, Defendant's counsel
objected to the fact that the phone had not appeared on the list of items seized from the home.
Defense counsel conceded on the record, however, that the Government had disclosed during
discovery that they had seized the cell phone and that they intended to use it at trial. Counsel did not
deny that he had never moved to suppress the phone or its contents. The District Court overruled
Defense counsel's objection, and the Government proceeded to introduce the cell phone through the
testimony of Officer Dalrymple, and to admit the four photographs retrieved from the phone, without

Three of the photographs depicted a woman's bare breasts and were identified at trial by the women depicted in the photographs as being pictures of them taken by the Defendant on his cell phone. The defense did not object to the jury viewing these photographs but did object to the jury viewing a fourth photograph that depicted L.G., who testified at trial and confirmed that she was the woman in the photo, performing oral sex on the Defendant. L.G. would have been about twenty-years old at the time the photograph was taken and she testified that oral sex became the price she paid for the oxycontin she received from the Defendant. With respect to this photograph, Defendant's counsel questioned the basis for permitting the jury to view the picture:

> But this one, this one in particular, I haven't said anything about the other three, but this one in particular, I don't see - I mean, it's clear that what we're - you know, that she's testified . . . . I just think it's - I mean - I mean, what is it proving, I mean?

(R. 95, TT2, Colloquy 288.) The Government responded as follows:

> It corroborates her testimony. The essential argument on the part of the defense is this is all lies. This is all - they're making this stuff up. This proves by its very nature that in fact this did in fact occur.

(*Id.* at 289.) The Court then observed:

> Well, what the government's saying, though, is that this goes to the witness's credibility, and that's - so you're going to - they should have - if you argue that they may or may not have engaged in an [sic] sexual act, we don't know that they did because of the drug abuse, because they have been attacking their credibility in some ways and saying they're lying about having engaged in some sexual act. . . . [I]f that's the issue, then I do think the government has the right to be able to show it.

---

further objection from Defendant's counsel. Defendant does not assert any argument on appeal regarding the cell phone or its contents other than the Fed. R. Evid. 403 objection to the one photograph.

13

(*Id.* at 291.) Defendant's counsel was unwilling to concede that the sexual act depicted in the photo

had occurred:

> So in essence, if I tell you that it's not an issue, then you leave it out is what you're
> saying, which I'm not prepared - which I wouldn't be prepared necessarily to say that
> anyway.

(*Id.* at 292.) The District Court then ruled that the photographs were relevant and that, in light of the

nature and quantity of similar evidence presented in the trial, their probative value was not

outweighed by their prejudicial effect:

> [S]adly, this whole case is full of evidence that's of this ilk. My job is to decide
> whether it's relevant, and then if it is, whether or not it's so prejudicial that it ought
> to be excluded, even though it's relevant.
>
> I do think - I'm going to overrule the objection - I do think the evidence is relevant
> to confirm the truthfulness of the testimony that is being offered, and I don't believe
> it's overly prejudicial, despite the graphic nature of the photograph. I don't think it's
> going to incite the jury to make a decision based on prejudice because of the
> photograph. . . . [I]f you believe that you ought to renew your objection because they
> haven't established a foundation for the introduction of it - yes, of course, none of
> this has been introduced yet. . . . [I]f there's problems with authentication and the
> way that they've been enlarged - obviously, that's not the size of the cell phone - then
> I do - then we'll address those issues at that particular time. . . . I think those are fair
> issues to kind of hold in abeyance. I'll overrule the objection. I'll allow admission
> of the photographs.

(*Id.* at 292-95.) Defendant's counsel did not further object on the basis of authenticity and Defendant

does not assert such an argument in his appeal.

The Sixth Circuit has opined: "Rule 403 of Federal Rules of Evidence excludes evidence

when its unfair prejudicial impact substantially outweighs its probative value. In balancing prejudice

and probative value, trial courts have considerable leeway. Because appellate courts work with a

record which cannot fully convey a trial's nuances, dynamics and atmosphere, they have a limited

14

capacity to review the balance struck by the trial court. Consequently, we will not reject a trial court's balancing unless the 'substantial prejudice' clearly outweighs the 'probative value.'" *United States v. Swift*, 809 F.2d 320, 323 (6th Cir. 1987) (citing *United States v. Brady*, 595 F.2d 359, 361 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S. Ct. 129, 62 L. Ed. 2d 84 (1979), which held that "[i]n reviewing a decision of a trial court on this issue we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect").

"[T]he prejudice to be weighed is the *unfair* prejudice caused by admission of the evidence. Evidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial pursuant to Rule 403." *United States v. Chambers*, 441 F.3d 438, 456 (6th Cir. 2006) (emphasis in original). "'Unfair prejudice,' as used in Rule 403, does not mean the damage to the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986). Finally, "[e]ven when the district court abuses its considerable discretion, that error is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Lloyd*, 462 F.3d 510, 516 (6th Cir. 2006) (internal citation and quotation marks omitted).

There is no question that the District Judge applied the correct legal standard under Fed. R. Evid. 403, in determining whether the probative value of this photograph was substantially outweighed by the danger of unfair prejudice. Nor did he err in permitting the jury to view this photograph. The photograph, that Defendant took, was retrieved from his cell phone. L.G., who testified at trial and was subject to cross-examination, identified herself in the photograph and

15

recalled that it was taken by the Defendant with his cell phone and that the act was performed in exchange for an oxycontin pill. The cornerstone of the defense in this case, as the District Court Judge articulated in his ruling, was Defendant's contention that he never had sex with these women in exchange for drugs and that they were all lying drug addicts. Notably, although given the opportunity, the Defendant was not willing to stipulate to the sexual act depicted in the photograph, which may have derailed the Government's efforts to introduce the photograph. Each witness's credibility was strenuously attacked and their implied penchant for dishonesty was a central theme of the defense. At the Sentencing Hearing, Defendant's counsel reiterated: "Our position is, and always has been, that Mr. Cobb did not engage in any sex with any of these alleged – I mean, any of the people that testified in this case." (R. 98, Sent. Hr'g Tr. 48.)

Nor did the District Court err in concluding that the photograph would not have an unfairly prejudicial effect on the jury. The jury heard the testimony of nine young women, all of whom testified in great detail to the extent of their sexual encounters with the Defendant and/or with other women at the Defendant's insistence and for his viewing pleasure. These jurors had already seen photographs, without objection by the defense, of young women baring their breasts for the Defendant to capture on his cell phone - women who at trial identified themselves in the photographs and testified that they bared their breasts in exchange for oxycontin pills. That the jurors also were able to see another photograph, albeit arguably of a more graphic nature, does not strike the Court as unfairly prejudicial under such circumstances.[6] The Government had a right to attempt to

---

[6]Cobb also argues that the District Court "should have provided the jury with an immediate instruction regarding the use of this evidence." Appellant Br. at 19. However, Cobb did not ask for

establish the credibility of its witnesses by corroborating evidence. Visual confirmation that one of them was telling the truth, at least about the sexual encounters which Defendant suggested did not occur, accomplishes that purpose and does not suggest a decision on an improper basis. Even if it was error to admit the photograph, in light of the overwhelming and otherwise disturbing evidence presented against the Defendant in support of the Government's distribution claim, it is highly unlikely that viewing the photograph materially affected the outcome of the trial. We find that the District Court did not abuse its discretion in admitting the photograph of L.G. performing oral sex on the Defendant.

**C.      The District Court Did Not Err In Ruling That D.A. Was Competent to Testify**

The District Judge relied on this Court's opinion in *United States v. Phibbs*, 999 F.2d 1053 (6th Cir. 1993), in ruling that D.A. was competent to testify at trial. We stated in *Phibbs*:

> [T]he Federal Rules of Evidence strongly disfavor barring witnesses on competency grounds due to mental incapacity. As we wrote in *United States v. Ramirez*, 871 F.2d 582, 584 (6th Cir.), *cert. denied*, 493 U.S. 841, 110 S.Ct. 127, 107 L.Ed.2d 88 (1989):
>
>> What must be remembered, and is often confused, is that "competency" is a matter of status not ability. Thus, the only two

---

a specific instruction regarding the picture, either at the time the picture was shown to the jury or when the District Court was reviewing proposed jury instructions with counsel. In fact, the District Court's proposed instructions repeated twice the general instruction that the verdict is to be limited to the charges in the indictment, and defense counsel objected that it was repetitive. (R. 96, TT3, Colloquy 213, 226.) The general instruction did not address specifically the proper use of the picture as evidence, but it was at least some instruction relating to the idea that the jury should not convict Cobb on the basis of his sexual acts. Defense counsel's objections resulted in that general instruction being given to the jury only once instead of twice, as originally proposed. The District Court did not plainly err by failing to provide a specific instruction regarding the proper use of the picture as evidence.

> groups of persons specifically rendered incompetent as witnesses by the Federal Rules of Evidence are judges (Rule 605) and jurors (Rule 606). The authority of the court to control the admissibility of the testimony of persons so impaired in some manner that they cannot give meaningful testimony is to be found outside of Rule 601. For example, the judge always has the authority under Rule 403 to balance the probative value of testimony against its prejudicial effect. Similarly, under Rule 603, the inability of a witness to take or comprehend an oath or affirmation will allow the judge to exclude that person's testimony. An argument can also be constructed that a person might be impaired to the point that he would not be able to satisfy the "personal knowledge" requirement of Rule 602. Again though, it is important to remember that such decisions by a trial judge to either admit or exclude testimony will only be reversed for a clear abuse of discretion. (Footnote omitted.)

999 F.3d at 1068-69.

A review of D.A.'s trial testimony, and the District Court's extensive efforts to ensure that D.A. understood the oath and was both competent and not impaired, convince this Court that the District Court did not abuse its discretion in concluding that D.A. was competent to testify. While D.A., much to the Government's frustration at trial, appeared to have difficulty remembering the facts as she had earlier allegedly reported them to Officer Dalrymple, this does not speak to her competence as a witness or her personal knowledge. Many witnesses suffer memory failures when testifying, and, standing alone, this is not a basis to exclude testimony. Defendant's counsel was free to attack D.A. on cross-examination, and to highlight to the jury her inability to recall events, to the extent he felt that might be necessary. Indeed, D.A.'s testimony, that she could not remember ever having sex with the Defendant and remembers receiving oxycontin from him only twice when she was "sick," appears to have been more supportive of the Defendant than the Government, as

18

evidenced by the Government's request part-way through her testimony to examine her as a hostile witness.[7]

The District Judge, in response to the Government's concerns that D.A. was acting "flighty" and its fear that she might not return following a lunch break, reminded D.A. of her obligation to appear and testify, which she did. Before the District Judge permitted her to testify, he examined her at great length outside the presence of the jury to ensure that she understood her obligation to be truthful, to ascertain whether she understood her right not to incriminate herself and determined that she was not suffering from any impediment that might compromise her ability to act as witness.

D.A. testified that she understood her obligation to tell the truth and understood the consequences of committing perjury. She further testified that she understood that she could ask for a lawyer at anytime. She testified that she was addicted to oxycontin and had taken one the night before at around 6:30 p.m. However, contrary to the claim made in Appellant's brief, D.A. specifically responded that she was not feeling the effects of that pill the morning of her testimony:

> The Court: So you used an OxyContin last night as well?
> D.A.: Yes. . . .

---

[7] In fact, is not at all clear that the Defendant objected to D.A.'s competence to testify at trial. It was the Government, not defense counsel, who initiated the Court's inquiry into D.A.'s "flighty" behavior. Moreover, after the District Judge questioned D.A. outside the presence of the jury to determine her competence and personal knowledge, both counsel indicated that they were satisfied that D.A. should proceed to take the stand. If the Defendant did not object to the District Court's decision to permit D.A. to testify, our review would be under the much more deferential plain error rule. "The plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and the prosecutor were derelict in countenancing it." *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994) (quoting *United States v. Slone*, 833 F.2d 595, 598 (6th Cir. 1987)). Under either the plain error or the abuse of discretion standard, it was not error for the District Court to permit D.A. to testify.

> The Court: Do you feel like the effects of the OxyContin you can still feel?
> D.A.: No.
> The Court: You don't feel like you can feel those effects?
> D.A.: No.

(R. 95, TT2, D.A. 196-97.) D.A. responded that she understood everything the Judge had asked her and that it had all been clear to her. After examining D.A., in the presence of both the Government and the Defendant and his counsel, the District Judge asked if either side had additional questions they wished to pose to D.A.. Both answered no. In addition to ascertaining all of this information before permitting D.A. to testify, the Judge ensured that the jury was not prejudiced in any way as to her testimony by having her step down from the stand and recalling her to the witness stand after the jury had re-entered the courtroom.

While this Court certainly cannot put itself in the position that the District Court enjoyed, and cannot appreciate any non-verbal inferences that may have accompanied D.A.'s testimony, a reading of her testimony gives no hint that she lacked either competence or personal knowledge. Among other moments of clarity, she expressly recalled spending Super Bowl weekend with the Defendant back in 2007 and informed the Court that she was an LPN and articulately identified each type of oxycontin pill by milligram, color and shape. Appellant's brief does nothing more than recite the legal standard and state in a conclusory fashion that D.A. was incompetent and impaired because she had trouble remembering if she ever had sex with the Defendant. This does not satisfy Defendant's burden. D.A. demonstrated neither a lack of understanding of her oath to tell the truth nor an impairment sufficient to deprive her of personal knowledge of the events to which she testified. Quite the contrary in fact. In short, there is absolutely no basis on which to conclude that the District

Court erred in permitting D.A. to testify. We affirm the District Court's decision to permit D.A. to testify.

> **D.      The Trial Court Properly Assessed a Two-Level Enhancement for Possession of a Firearm Available for Use in Connection with Distribution of a Controlled Substance**

"On appeal, sentences are reviewed for reasonableness under an abuse of discretion standard. The reasonableness determination has both a procedural and substantive component." *United States v. Brown*, 579 F.3d 672, 677 (6th Cir. 2009) (citing *United States v. Booker*, 543 U.S. 220, 260-61, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) and *United States v. Sedore*, 512 F.3d 819, 822 (6th Cir. 2008)). Procedural error may  include "'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range.'" *Id*. (quoting *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 597, 169 L.Ed.2d 445 (2007)). A substantive error would be based on a finding that the sentencing court "'select[ed] the sentence arbitrarily, bas[ed] the sentence on impermissible factors, ... or [gave] an unreasonable amount of weight to any pertinent factor.'" *Id*. (quoting *United States v. Webb*, 403 F.3d 373, 385 (6th Cir. 2005)). "The district court's interpretation of the advisory guidelines is reviewed *de novo,* and its findings of fact are reviewed for clear error." *Brown*, 579 F.3d at 677. The District Court is accorded great deference in applying the sentencing guidelines to the facts. *Id*. (citing *United States v. Kosinski*, 480 F.3d 769, 774 (6th Cir. 2007)).

Pursuant to United States Sentencing Guidelines Section 2D1.1(b)(1), the Government and the PSR recommended an increase of two levels for the Defendant's possession of a firearm in connection with his distribution of oxycontin. Section 2D1.1(b)(1) provides: "If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." The enhancement under 2D1.1(b)(1) will be applied where the government can establish "that (1) the defendant actually or constructively possessed the weapon and (2) such possession was during the commission of the offense." *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996). The analysis of the enhancement's applicability involves a burden-shifting test:

> "Constructive possession of an item is the 'ownership, or dominion or control' over the item itself, 'or dominion over the premises' where the item is located." *Id.* (citation omitted). "Once it is established that a defendant was in possession of a weapon during the commission of an offense, a presumption arises that such possession was connected to the offense." *Id.* The burden then shifts to the defendant to show that "it is clearly improbable that the weapon was connected to the offense." *Id.*

*Hill*, 79 F.3d at 1485 (quoting *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir.1991) citing U.S.S.G. § 2D1.1, application note 3). The guidelines do not require that the firearms be "readily accessible" to support application of the enhancement; it is sufficient if they "could have facilitated" the underlying offense. *United States v. Tisdale*, 952 F.2d 934, 937 (6th Cir. 1992).

In this case, the PSR reported that T.M. once traded a stolen firearm to the Defendant in exchange for oxycontin. T.M. confirmed this in her testimony at trial: "I was - I traded a gun to him for a pill, and it was a stolen gun. He went and showed it off to this guy that it got stold [sic] from him, so I went to jail for that, and doing six months for it." (R. 95, TT2, T.M. 122.) T.M. testified that she took the stolen gun to the Defendant "in trade for a pill." (R. 95, TT2, T.M. 133.)

In this case, the Defendant objected to the two-level firearms increase "due to the fact that at no time has [Cobb] been charged with any firearms offense." The Defendant further objected because there was no evidence presented that the drugs and the firearms were present together, focusing on firearms that were seized during the search of the Defendant's camper/trailer.[8] At the sentencing hearing, during the discussion of Defendant's objections to the two-level enhancement, Defendant's counsel reiterated his contention that the connection between the firearms and ammunition and the alleged drug offense was too remote. (R. 98, Sent. Hr'g Tr. 42-43.) Defense counsel conceded his understanding that actual possession is not required and that "[i]f it is around, it could be perceived as some sort of threat or some sort of, you know, coercion in some form or fashion." (*Id.* at 43.) He maintained, however, that "very few witnesses ever said anything about Mr. Cobb . . . having any weapon." (*Id.*)

The District Judge permitted the Defendant to speak at the sentencing hearing to rebut T.M.'s testimony that he had traded her oxycontin for a stolen gun. The Defendant maintained that he

---

[8]In reaching its decision to apply the enhancement, the District Court also relied on the fact that firearms were seized from the Defendant's camper/trailer and on facts set forth in the PSR indicating that firearms were present in the camper/trailer during parties at which the Defendant distributed oxycontin to conclude that it was not "clearly improbable" that firearms were connected to the distribution of oxycontin. The PSR reported that a search of Defendant's camper uncovered two firearms, a revolver and a rifle with ammunition. The PSR stated that E.L. had recounted that she attended a "naked party" at Defendant's camper, during which he distributed oxycontin pills to several girls who engaged in various sexual acts with the Defendant during the party in exchange for the pills. E.L. stated that she saw a firearm in the camper/trailer during the "naked party." The PSR further reports that D.A. stated that the Defendant "often bragged about having powerful friends" and "could mess up the lives of anyone who cooperated against him." D.A. indicated that the Defendant "always kept a firearm with him." The PSR further reported that A.G., L.G.'s mother, indicated that her late husband and the Defendant "traded guns with each other." These facts were not mentioned at trial.

actually purchased the gun from T.M. and that she wrote him a receipt. (R. 98, Sent. Hr'g Tr. 44-45.) Notwithstanding Defendant's statement, the District Court overruled Defendant's objection and allowed the two-level increase, observing:

> [T]here's evidence that has been presented, a statement by the defendant as it relates to a particular weapon and how that came in his possession. But on the other side of that is the testimony that has come into court from [T.M.], who testified that she traded a firearm to the defendant in exchange for the drugs. And then the broader evidence and the broader information that is before the Court with respect to the presence of firearms and the possession that the defendant had of these firearms while distributing the oxycodone and distributing the drugs on many, many different occasions.
>
> Again, the evidentiary standard's different here in the context of the sentencing. I do think there's a preponderance of the evidence that suggests, though, that you had access to a firearm, you possessed that firearm, and that you possessed it in relationship to these drug transactions. And so I think that two-level increase is appropriate in this case, and so I'll overrule objection number 4 as well.

(R. 98, Sent. Hr'g Tr. 47-48.)

In *United States v. Gibson*, 135 F.3d 1124 (6th Cir.), *cert. denied*, 524 U.S. 922 (1998), this Court faced the precise issue presented in this case, i.e. the application of the Section 2D1.1(b)(1) enhancement where the weapon was the quid pro quo for the underlying drug transaction. In *Gibson*, the defendant made several sales of crack cocaine to an undercover agent over a period of time. For the last sale, at the undercover agent's urging, the defendant accepted an automatic pistol in exchange for the crack cocaine. *Id*. at 1128. The district court, recognizing the somewhat unusual factual scenario underpinning the request for the two- level enhancement under Section 2D1.1(b)(1), concluded that the weapon was "the essence of the February drug transaction" and applied the enhancement. *Id*.

24

Reviewing the district court's application of the enhancement in *Gibson*, this Court also recognized the novel factual presentation, noting that research had "failed to locate a case applying or rejecting the application of Section 2D1.1(b) to the delivery of an unloaded gun by an undercover police officer to a seller of a controlled substance as the quid pro quo for the transaction." *Id*. This Court then examined Application Note 3 to Section 2D1.1(b)(1) which provides:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

In *Gibson*, noting that the "finding which negates the application of the enhancement is lack of a connection to the offense," this Court examined the common meaning of the term "connected" and concluded that the firearm was indisputably "linked" to the offense. Because the defendant did possess the firearm, and the firearm was "connected" to the offense, this Court upheld application of the enhancement. 135 F.3d at 1128.

We begin our analysis of the trial court's application of the enhancement in this case with the understanding that a district court is accorded great deference in applying the sentencing guidelines to the facts. *Brown*, 579 F.3d at 677. In this case, the District Judge was able to assess the credibility of both T.M. and the Defendant in relation to whether the Defendant in fact traded T.M. oxycontin in exchange for a firearm. This Court will not substitute its judgment for that of the District Court. Moreover, this situation is not analogous to having an unloaded hunting rifle in the closet.

The Defendant's argument that the two-level increase should not have been applied because he was not charged with a firearm offense is inapt - the Defendant need not be charged with a firearm offense for the two-level increase to be applied. He need only constructively possess a weapon during the commission of an offense to face the presumption that the firearm was connected to the offense. *Hill*, 79 F.3d at 1485. Under this Court's opinion in *Gibson*, upholding application the Section 2D1.1(b)(1) enhancement where a firearm was traded to the defendant as the quid pro quo for a controlled substance, it was appropriate for the trial court to apply the two-level enhancement to the Defendant's delivery of oxycontin as the quid pro quo for a firearm that he received from T.M. in exchange. As in *Gibson*, the firearm "was the essence" of the transaction between the Defendant and T.M. – it was the basis of, and the reason for, the exchange. "It is beyond dispute that the defendant 'possessed' the firearm and that the firearm was linked, i.e., "connected," to the offense." *Gibson*, 135 F.3d at 1128. Admittedly, this is not the typical fact pattern that supports application of an enhancement under Section 2D1.1(b)(1). However, as this Court concluded in *Gibson*, a literal reading of the Guidelines and Commentary clearly supports application of the enhancement based upon such an exchange.

We find no error in the District Court's conclusion that the Defendant possessed a firearm in connection with his distribution of oxycontin. Accordingly, we AFFIRM the District Court's application of the two-level increase under § 2D1.1(b)(1) and deny Defendant's request for a remand and resentencing.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the conviction and **DENY** the request for a remand

and resentencing.